## UNITED STATES v. WEXLER.[*]
### No. 67.

Circuit Court of Appeals, Second Circuit.
Nov. 4, 1935.

*Writ of certiorari denied 56 S. Ct. 384, 80 L. Ed. ——

See, also, 6 F. Supp. 258.

A. M. Frumberg, of New York City (Julius I. Puente, and William H. Griffin, of Washington, D. C., of counsel), for appellant.

F. W. H. Adams, U. S. Atty., Francis A. Mahony, Asst. U. S. Atty., and Richard J. Burke, Sp. Asst. U. S. Atty., all of New York City, for the United States.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge.

Wexler, the accused, was indicted upon four counts; the first and third being for conspiracy to defraud the income tax; the second and fourth for an attempt to defraud it. The first and second counts were for the year 1930; the third and fourth for 1931. The allegations of the conspiracy counts were that he had been engaged in New York and New Jersey in making and selling beer, out of which he had derived a very large income, to help him to conceal which two of the conspirators, Cohen and Gurock, had deposited it in New York and New Jersey banks subject to his order. Wexler was to complete the fraud by filing income tax returns which reported only a trifling income. There were a number of overt acts, one of which was that he had in fact filed the proposed false income tax return. The substantive counts charged that Wexler, Cohen, Gurock, and one Baker attempted to defeat the income tax law by filing the returns, knowing that Wexler's income was very much larger than they disclosed. The jury brought in a verdict of guilty on all four counts, and the judge imposed a sentence of two years on count 1 and five years on count 2, to be served concurrently; and of an added two years on count 3, and five years on count 4, to be served concurrently, thus making a total term of ten years. He imposed a fine of $10,000 on count 2 and an added fine of $10,000 on count 4; of $10,000 on count 1 (to be suspended if the fine on count 2 was paid); and of $10,000 on count 3 (to be similarly suspended). He added as a fine the costs of the prosecution, $876.

The first objection is that conviction upon the conspiracy counts necessarily covered the attempts, and that for this reason the sentence was a double punishment. This argument does not go so far as to say that a conspiracy and the crime of which it is the object may not ordinarily be laid as separate counts in one indictment, or that sentence may not be imposed upon each count; and in so conceding it is clearly right. Carter v. McClaughry, 183 U. S. 365, 394, 395, 22 S. Ct. 181, 46 L. Ed. 236; Bens v. U. S., 266 F. 152 (C. C. A. 2); Morgan v. Aderhold, 73 F.(2d) 171 (C. C. A. 5); Wharton on Criminal Law (11th Ed.) § 1654. The distinction on which the appeal pro tanto goes is that among the overt acts in each conspiracy count was the filing of the return, and that that was the attempt itself. Hence the conviction upon these counts necessarily included all the facts making up the attempt and the judge imposed two sentences for the same crime. Reynolds v.

528

U. S., 280 F. 1 (C. C. A. 6); Morgan v. U. S., 294 F. 82 (C. C. A. 4); Miller v. U. S., 300 F. 529, 534 (C. C. A. 6); Schroeder v. U. S., 7 F.(2d) 60, 64 (C. C. A. 2); Segurola v. U. S., 16 F.(2d) 563, 566 (C. C. A. 1); U. S. v. Levinson, 54 F.(2d) 363 (C. C. A. 2). While an overt act only serves to show that the venture was not mere talk, it is nevertheless as much a condition to conviction as the criminal agreement itself, and some reason must be found for distinguishing it, as regards the question of double punishment. There is such a reason. Back of the doctrine that a man should not be punished again, for a crime which is a part of another crime which he must expiate, lies the notion that the penalty for the greater crime is the measure of the social disapproval and the social vengeance exacted for the whole conduct comprised in the definition of the greater. To punish all of that once, and a part of it again, violates this implication. But the overt acts in a conspiracy have no such relation to the criminal agreement; for while it is true that they must be in execution of the agreement, they need not be acts forbidden in themselves, that is, criminal for any other reason than just because they do execute it. By themselves they may be entirely innocent, and if by chance they are otherwise, they do not on that account infect the conspiracy with their proper criminality, though it must be owned that they may influence the sentence. Were they in that sense part of the conspiracy, it would be inconsistent to fix a smaller sentence for it than is imposed for the substantive crime, though that is commonly exactly what is done.

■■ This conclusion is borne out by those decisions which hold that an acquittal of conspiracy is not a bar to prosecution for the substantive crime, even when that was the single overt act laid in the conspiracy indictment. Kelly v. U. S., 258 F. 392 (C. C. A. 6); Bens v. U. S., supra, 266 F. 152; Moorehead v. U. S., 270 F. 210 (C. C. A. 5); Bell v. U. S., 2 F.(2d) 543 (C. C. A. 8). Acquittal of a greater crime is always a bar to prosecution for a lesser, whenever the accused could have been convicted of the lesser on the first prosecution. Ex parte Nielsen, 131 U. S. 176, 186, 9 S. Ct. 672, 33 L. Ed. 118; Reg. v. Gould, 9 Car. & P. 364; Reg. v. Bird, 2 Denison, 94; Russell on Crime, Book XII, chap. II, subd. 3; Wharton on Crim. Law (11th Ed.) § 393; Bishop, New Crim. L. § 1054. Since it is always proper to add a count for the substantive offense along with a conspiracy count, it follows from those decisions that the substantive crime when laid as an overt act is not a constituent of the conspiracy; and so indeed the opinions expressly declare.

■ But even if conviction for conspiracy were such a bar when the only overt act laid was the substantive crime, still the result must be otherwise when there are several. For then it is impossible to say which overt act the jury found to have been committed, or that the sentence for the conspiracy covered the substantive crime. To protect himself the accused would then be obliged to demand that the prosecution abandon the substantive crime as an overt act; and a denial of that demand might be a vital error, since it would by hypothesis expose him to the danger of double punishment. Otherwise the record remains ambiguous, and the accused who has the burden of proof on such an issue must lose. Wexler made no such demand and is therefore out of court even though the doctrine he invokes applied, as it does not, to situations where there is but one overt act. In Krench v. U. S., 42 F.(2d) 354 (C. C. A. 6), the conviction upon a conspiracy count was indeed reversed because the conspiracy was in fact involved in the commission of the substantive crime. This ruling did not concern any overt act, and, moreover, appears to us to be opposed to the general doctrine. It depended upon the fact that in that particular case the accused had not personally imported the offending liquors, but had used for that purpose those alleged in the conspiracy count to have been his confederates. The court said that if both sentences stood, he would be punished twice for the same crime. But it is not the identity of the evidence that counts, but of the elements which make up the two crimes; so that it was not material that the liquors chanced to have been imported by the confederates. Thus in Albrecht v. U. S., 273 U. S. 1, 11, 47 S. Ct. 250, 71 L. Ed. 505, the same evidence which proved the sales in fact proved the possession; but since the sale might be made without possession, that circumstance was indifferent; the elements of one crime did not include all those of the other. Cf. Blockburger v. U. S., 284 U. S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306.

■ The next question is of the sufficiency of the evidence, which is too voluminous to recite in more than outline. That outline is as follows: The Eureka Brewery was a New Jersey corporation making beer at Paterson, for the most part illicitly. It was owned by four men, one of whom, Donovan, was killed in September, 1929, and another, Dunn, in March, 1930. Wexler, who had been living in New York, appeared in Paterson shortly after Dunn's death, and occupied the apartment of one of the two surviving owners, Culhane, paying Culhane's unpaid balance of rent. In May he rented a house for himself in Paterson in his valet's name, and lived there during 1930 and 1931. He at once began to exercise a good deal of authority over the business—just how much is not very clear. To several persons he declared that he was its owner, and the direction over it which he assumed tended to confirm what he said. His explanation upon the stand of his intervention in its affairs was that he was acting for two others, Hassell and Greenberg, both of whom were killed in 1932, and who were, he said, the new owners, and gave him only a small percentage of the profits. Enormous sums, amounting to over $2,000,000 each year, were traced from the sales of Eureka beer into the hands of two persons, Cohen and Gurock, who deposited them in two banks under fictitious names which they continually changed. Since by far the greater part of the business was illicit, these efforts to conceal the money ought not, however, necessarily to be attributed to a plan to escape the income tax, though it fitted well enough with that purpose as well. It was important, and indeed necessary, to establish that Cohen and Gurock held the money for Wexler. He swore that they held it for Hassell and Greenberg, for whom he too worked, and it is true that at one time Cohen had been the employee of a firm of which Wexler and Greenberg were members. But both Cohen and Gurock had been Wexler's employees up to the time when he went to Paterson, and Cohen was shown to have been intimately in his confidence. Furthermore, it was established that out of the accounts a large motorcar was bought for Wexler, which he used as his own, and that payments of about $13,500 were made to the Paramount Hotel Corporation, whose debts Wexler had guaranteed. In addition, he himself deposited in them his own moneys and dividends of his wife's insurance policies. Again, though in 1930 he had returned an income of only $8,125, he lived luxuriously, the rent of his apartment was $6,000, and other personal expenses of over $5,000 were brought home to him. In April, 1933, the Bureau of Internal Revenue asked him for an interview as to his returns, and he fled. Search for him was unsuccessful, he was indicted on April 27th, and finally on May 21st was found hiding in a remote and secluded house in the country. When arrested, he at first denied his identity.

It is apparent from the foregoing that there was a case for the jury. The change in ownership of the brewery was conceded; the only question was whether Wexler had succeeded to it, or Hassell and Greenberg, as he asserted. He had assumed a substantial share in the new management, and had repeatedly called himself the owner. The proceeds were within the control of two of his former employees, one of whom had never had any relations with the supposititious owners, Hassell and Greenberg. To some extent, at any rate, the accounts had been used for his benefit and he had otherwise treated them as his own. He lived on a scale beyond his declared income; and he gave cogent evidence of guilt by running away when his tax was questioned. His explanation was at best unlikely, and no jury ought to have accepted his word, for his untrustworthiness was demonstrated. He had been convicted a number of times for thieving of one sort or another, and his parole had been often revoked; he had been engaged in running a hotel of at least equivocal character; and he could show no honest means of livelihood. On what theory we are to say that there was no evidence to convict him we find it hard to learn. Not only was there enough, but it would be difficult to see how an honest jury could have taken any other view.

■ He complains of the conduct of the prosecution at the trial, its intemperate denunciations, its irrelevant appeals to passion, the introduction of damaging and immaterial evidence against him. We do not forget that very recently this was made the sole basis for the reversal of a conviction (Berger v. U. S., 295 U. S. 78, 55 S. Ct. 629, 79 L. Ed. 1314), and with that admonition before us we have felt bound to look somewhat jealously for any abuse of his position by the prosecuting attorney. We can find none. It is impossible to

expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericordiam which long custom has come to sanction. The question is always as to the particular incident challenged, in the setting of the whole trial. In the case at bar all the prosecution's arguments were, so far as we can see, supported by the evidence or by reasonable inference from it, though at times they were certainly denunciatory. Wexler had made away with evidence, and there was much reason to suppose that he had threatened witnesses either himself or through his agents. It was little, if any, exaggeration to say that he had "spent his entire life from his childhood in cheating and robbing and assaulting and worse," and had "never earned an honest penny in his entire forty-seven years." His credibility was certainly at issue, and while that kind of rhetoric seems to us intemperate and feeble, it cannot be said to step beyond limits permissible to those who like it. The comments upon the appearance and posture of the witnesses and their fears were entirely proper, if justified in fact, which we have no reason to suppose that they were not. As to any abuse in examination the only serious question concerns the deaths of Hassell and Greenberg and Dunn and Donovan. Those of Hassell and Greenberg were certainly relevant, for Wexler put them forward as the owners of the business, and the prosecution might well argue that he did so because they were not available. The deaths of Dunn and Donovan were the occasion, if not the cause, for Wexler's taking over the business. It did appear in the case of each of them that they had been killed, murdered indeed; but this was not involved in the prosecution's questions, but volunteered by the witness, and, when it first appeared, there was nothing to implicate Wexler in their taking off. Later, however, the officer who was repeating his answers under arrest said: "I asked him who the murderers were of Max Greenberg and Hassell and he said he did not wish to tell me * * * He said that it would not do the government any good

to know. He said he took care of those matters in their (sic) own way." This indeed had no relevance to the issues, and it was certainly prejudicial; not all that a prisoner says upon his arrest may be used against him, and this should have been kept out. But though it was an error not to exclude it, it is not alone enough to reverse a judgment otherwise right. Wexler had in any case so smirched himself by his own admissions that this intimation of his privity with the death of Hassell and Greenberg—for it really came to that—could not in reason have turned the scale against him. We will not catch at such a straw when the result is obviously correct, and especially when the testimony came out without any prompting by the prosecution, which counsel for the defense twice chose to compliment upon the fairness of its conduct throughout the trial. As to keeping Wexler's wife off the stand, it is not necessary to say more than that every one then supposed this to be the law and that the defense agreed that it should be done. The pretense that it was unfair thereafter to allow her cheques and deposit slips in evidence needs no reply.

Judgment affirmed.