[Cite as *State v. Ibn-Ford*, 2013-Ohio-2172.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

    v.

KHALID HAQQ IBN-FORD

    Appellant

C.A. No.    26386

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 11 06 1597

DECISION AND JOURNAL ENTRY

Dated: May 29, 2013

CARR, Judge.

{¶1}    Appellant Khalid Haqq Ibn-Ford appeals his conviction in the Summit County Court of Common Pleas.  This Court affirms in part, reverses in part, and remands.

I.

{¶2}    Ibn-Ford was indicted on one count of rape, a felony of the first degree; and four counts of domestic violence, two felonies of the fourth degree and two misdemeanors of the second degree.  After he stood mute at arraignment, the trial court entered a technical plea of not guilty on his behalf.  Two supplemental indictments were filed, adding a repeat violent offender specification to the rape count, and charging Ibn-Ford with four additional counts of domestic violence, two felonies of the third degree and two misdemeanors of the first degree.  The alleged victim in regard to all counts was Ibn-Ford's wife T.F.  The defendant pleaded not guilty at arraignment on the supplemental charges.

{¶3} The matter was scheduled for trial. This Court gleans from the record that a jury was impanelled and the trial court apparently issued preliminary rulings on some oral motions in limine. We further glean that Ibn-Ford thereafter withdrew his prior plea of not guilty and pleaded guilty to amended charges, including a count of gross sexual imposition in lieu of rape, and two counts of domestic violence. The State filed a sentencing memorandum.

{¶4} Before he was sentenced, Ibn-Ford filed a motion to withdraw his guilty plea. The State responded in opposition, appending what purports to be a copy of a transcript from the change of plea hearing. The transcript is not time-stamped and no official copy otherwise appears in the record. The trial court held a hearing on Ibn-Ford's motion to withdraw his plea. In support of his motion, the defendant asserted that he discovered new evidence that he believed would exculpate him. In addition, he asserted that he initially pleaded guilty based on the trial court's preliminary evidentiary rulings. The State continued to argue in opposition to the motion to withdraw.

{¶5} The trial court, after noting that pre-sentence motions to withdraw pleas should be liberally granted and further that it had concerns as to whether the defendant was paying attention to the proceedings during his prior change of plea hearing, granted Ibn-Ford's motion to withdraw his guilty plea. The trial court informed Ibn-Ford that it would schedule a date for trial on the original nine counts and specification as indicted. Apparently experiencing another change of heart, Ibn-Ford informed the court that he wished to "get it done right here today" and "plead guilty right now and get it over with" despite his continued assertions that he would be admitting to "something I ain't do." The trial court scheduled the matter for trial.

{¶6} Immediately prior to trial, the State dismissed the first four counts of domestic violence and proceeded merely on the count of rape, the repeat violent offender specification,

two counts of domestic violence (felonies of the third degree), and two counts of domestic violence (misdemeanors of the first degree). The parties then discussed preliminary matters with the court including stipulations and two pro se motions filed by Ibn-Ford. The trial court declined to consider the pro se motions because the defendant was represented by counsel. Finally, defense counsel noted that the State had earlier filed two notices of intent to use other acts evidence, including evidence of Ibn-Ford's prior acts of violence, including sexual assaults, on his wife (the victim in this case), and his wife's then-11-year old daughter. Ibn-Ford argued that presentation of that evidence was not relevant to the instant prosecution, was too prejudicial, and would only serve to "taint [] Ford in a bad light." The trial court issued a preliminary ruling that it would allow the introduction of the other acts evidence through the testimony of the victim and her daughter.

{¶7} The matter proceeded to trial. At the conclusion of trial, the jury found Ibn-Ford guilty of rape and four counts of domestic violence. It further found that the defendant had previously been convicted of domestic violence and child endangering. At a separate hearing, the trial court heard evidence and found that Ibn-Ford was a repeat violent offender and a Tier III sexual offender. The trial court then sentenced the defendant. Ibn-Ford appealed, raising seven assignments of error for review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED BY DENYING [IBN-FORD'S] CRIMINAL RULE 29 MOTION FOR ACQUITTAL AS THE STATE FAILED TO PR[E]SENT SUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTIONS.

{¶8} Ibn-Ford argues that the trial court erred by denying his Crim.R. 29 motion for acquittal in regard to his rape and domestic violence convictions. This Court disagrees.

**{¶9}** Crim.R. 29 provides, in relevant part:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Galloway*, 9th Dist. No. 19752, 2001 WL 81257 (Jan. 31, 2001) quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶10}** The test for sufficiency requires a determination of whether the State has met its burden of production at trial. *State v. Walker*, 9th Dist. No. 20559, 2001 WL 1581570 (Dec. 12, 2001); *see, also*, *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

**{¶11}** Ibn-Ford challenges his convictions for rape in violation of R.C. 2907.02(A)(2) and domestic violence in violation of R.C. 2919.25(A) and (C).

**{¶12}** R.C. 2907.02(A)(2) states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Pursuant to R.C. 2901.22(A): "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C.

2901.01(A)(1). Ibn-Ford does not dispute that he and his wife engaged in sexual intercourse, i.e., sexual conduct. He argues simply that the sexual relations were consensual.

{¶13} R.C. 2919.25(A) states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(C) states that "[n]o person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). "Physical harm to persons" is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). R.C. 2919.25(F)(1) defines "family or household member" as

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender.

(b) The natural parent of any child of whom the offender is the other natural parent or is the putative other natural parent.

{¶14} The charges against Ibn-Ford arose out of events that occurred on consecutive days. The indictment alleged that the rape and two counts of domestic violence occurred on June 19, 2011, when Ibn-Ford and his wife were staying at a hotel in Akron, while the remaining two counts of domestic violence occurred on June 20, 2011, at Akron City Hospital.

{¶15} The following facts are not in dispute and frame the context for the events on both days. Ibn-Ford and the victim first met when he was 26 years old and known as Dwight Jackson and the victim was 16 years old. They got married at the end of 2001, but divorced in 2004. They remarried in April, 2011. The victim has adrenal gland cancer and has a limited life expectancy. The parties stipulated that Ibn-Ford has a prior conviction for domestic violence against the same victim and a prior conviction for child endangering arising out of his conduct relating to the victim's then-eleven-year old daughter, P.D. Based on the circumstances of Ibn-Ford's child endangering conviction, he is not permitted to have any contact with the victim's children. Ibn-Ford and the victim have a daughter who was 8 years old at the time of the events giving rising to the instant charges. They would all stay together in a hotel to allow Ibn-Ford to spend time with his daughter away from the victim's other children.

June 19, 2011

{¶16} The victim's daughter, P.D., who was 18 years old at the time of the trial, testified that, while Ibn-Ford acted appropriately when he was not on drugs, her step-father was otherwise aggressive and abusive, hitting her mother, aunt, and brothers. P.D. testified that Ibn-Ford began taking her to school in 2004 when she was in sixth grade and that he began kissing her, touching her breasts and vagina, and eventually raping her. She testified that Ibn-Ford hit her with a belt and threatened her with a gun during one rape and a knife during another. He told her not to tell her mother or he would kill both her mother and her. P.D. testified that Ibn-Ford was ultimately convicted of child endangering based on the rapes and assaults he committed against her. Finally, she confirmed that Ibn-Ford was not allowed to be in her mother's home, so he and her mother stayed together in hotels. P.D. testified that they did so on June 19, 2011.

{¶17} The victim (Ibn-Ford's wife) had become ill and was hospitalized at the time of trial, so she testified from her hospital bed in the presence of the defendant, counsel, and the trial court judge. Although she had taken pain medication and was drowsy, she asserted that she understood the questions and could respond appropriately.

{¶18} The victim testified that Ibn-Ford beat her most of the time since she first met him. She further testified as follows. She married the defendant because she did not want to continue to have sexual relations with him outside of marriage based on her religious convictions. He remained violent during their marriage. She divorced him in 2004 after he raped her minor daughter. The family moved to California but she returned to Ohio and agreed to meet with Ibn-Ford in 2011. She forgave him for his past abuse against her and her daughter and the couple remarried, although they only stayed together at hotels because Ibn-Ford was not allowed to have contact with any of the victim's children. The victim understood that that included the couple's biological daughter, although she brought that child with her to the hotel to spend time with the defendant.

{¶19} The victim brought her 8-year-old daughter and 5-year-old grandson with her to the Value Place hotel where Ibn-Ford was staying with them for about a week. Ibn-Ford had gone to his sister's house but called the victim around 3:00 a.m. on June 19, 2011, to tell her that he was coming to the hotel, that she had better have the door unlocked, and that he wanted to have sex with her. The victim told him that she was in a lot of pain and did not want to have sex at that time. When Ibn-Ford arrived, the victim tried to go back to sleep, but the defendant pressed her for sex. When she refused, he ripped off the victim's shirt and tried to pull off her pants. Because his attempts to remove her pants were painful and felt as though her pants were cutting her, the victim removed her pants. Ibn-Ford then ripped off the victim's underwear.

When she again refused to have sex with him, Ibn-Ford put his arm around her neck and began strangling her. He threatened to kill her and himself and told the victim that Children Services Board would come and take her children. Because she knew Ibn-Ford to follow through on prior threats, she did not scream and complied with the defendant's insistence that they have sex. Ibn-Ford attempted to insert his penis in her anus. Failing that, he inserted his penis into the victim's vagina.

{¶20} After Ibn-Ford ejaculated in her vagina, the victim went to the bathroom and then to bed with her minor daughter who was asleep. Ibn-Ford said, "Bitch, get up." When the victim refused, the defendant retrieved a steak knife from a cabinet and cut the victim twice on her forearm. Ibn-Ford then made her perform oral sex on him and he again engaged in penile-vaginal sex with her. Ibn-Ford then fell asleep and the victim cried herself to sleep.

{¶21} In the morning, the victim's home health aide arrived at the hotel to help the victim with daily activities. While the aide took the children with her to take out the trash, Ibn-Ford told the victim he was going to whip her. He told her to lie across the bed and he "whooped" her buttocks with his belt. He then inspected her buttocks to make sure that he had not left any marks. The victim asserted that her husband had assaulted her in a similar manner over the years: telling her she was going to get a "whooping," making her remove her clothes, hitting her with his belt or heel of his shoe, and inspecting her afterwards for physical evidence of the beating. She testified that she stayed with Ibn-Ford despite the physical abuse because she loved him.

{¶22} When the victim's aide returned to the hotel room with the children, everyone got in a car and left. Ibn-Ford drove to his sister's house. The victim then drove her aide and the two children to her house. She did not mention either the assaults or rape to her aide. Her aide

later accompanied her when she drove one of her children's friends home. Feeling ill in the car, the victim stopped at a gas station and passed out in the restroom. The victim awoke to find herself in Akron City Hospital.

{¶23} Richard Layer, an emergency medical technician with the Copley fire department, testified that he responded to an emergency call during the evening of June 19, 2011. He found the victim unconscious in a gas station bathroom and transported her to Akron City Hospital. Although the victim's level of consciousness improved as they neared the hospital, Mr. Layer testified that she was nauseous and that the two did not discuss prior events of the day. He had no further contact with her after leaving her at the hospital.

{¶24} Officer Gregory Moenich of the Akron Police Department testified that he was dispatched to Akron City Hospital in the early morning hours of June 20, 2011, regarding an altercation involving a male. As part of his investigation, he spoke with the victim and noticed some fresh-looking cuts on her forearm. Although he tried to elicit additional information from the victim, she was reluctant to speak to him.

{¶25} Valorie Prulhiere, R.N., a forensic nurse examiner, testified that she is the manager of Summa Health Center's Developing Options for Violent Emergencies ("DOVE") Center. She testified that DOVE's main focus is meeting the emergency needs of patients who have been exposed to violence, although the center also strives to collect evidence in a way that maintains the patient's dignity. She explained the process as follows. After introducing herself and explaining the center's purpose, she obtains the patient's informed consent which necessarily requires that the patient display lucidity. She then obtains a general health history from the patient and inquires regarding the reason for the patient's referral to DOVE. This guides her subsequent physical and mental assessment of the patient. Ms. Prulhiere then conducts a head-

to-toe assessment of the patient, which includes observing, touching, asking questions, taking photographs, and collecting samples for later analysis, particularly in cases of alleged sexual assaults. Finally, she works with the patient to develop a safety and discharge plan which may include referrals for other services.

{¶26} Ms. Prulhiere testified that victims of trauma respond uniquely and in many ways. Some express anger or sarcasm. Some cry; some laugh; some withdraw within themselves. In addition, some victims remember the traumatic event in great detail, while others have a limited recollection or cannot remember any details. Moreover, Ms. Prulhiere testified that it is very common for victims to delay reporting incidents of violence or sexual assault. In fact, she testified that she is often the first person to whom a victim discloses the incident. She further explained the dynamics of "intimate partner abuse" as opposed to abuse by a stranger. Ms. Prulhiere testified that a victim who is abused by a spouse often does not even recognize the situation as sexual assault because cultural, generational, and/or moral issues prevent her from understanding that sexual relations can occur as a result of force in a marital relationship. Finally, she testified that it is relatively common that a victim is referred to DOVE based on a physical assault and only then does the victim disclose incidents of sexual assault as well.

{¶27} Ms. Prulhiere testified that the victim in this case was referred to her following a physical assault while she was in the hospital after she lost consciousness at a gas station. She testified that the victim was alert and oriented to time, place, and identity. She testified that the victim initially complained of pain in her face and buttocks. She described her demeanor as tearful, yet cooperative. The victim informed her that her husband had assaulted her.

{¶28} As Ms. Prulhiere conducted her assessment of the victim, the victim disclosed a pattern of long-term abuse by Ibn-Ford. Ms. Prulhiere testified that the victim reported that her

husband frequently "whoop[s]" her with a belt, hits her over the head, "chokes" her, almost "kill[ing] [her] in February," and "puts his hand over [her] mouth." The victim further reported a history of forced sexual relations with her husband, most recently on June 19, 2011. Ms. Prulhiere testified that the victim reported that Ibn-Ford attempted to penetrate her anus with his penis, but that he was unsuccessful. He then forced his penis into her vagina and ejaculated. The victim reported that her husband had ripped off her panties and used a knife to cut her right arm. The victim complained that her vagina hurt. Ms. Prulhiere testified that the victim was able to distinguish pain associated with her recent assaults from the normal pain associated with her cancer.

{¶29} Ms. Prulhiere observed laceration marks on the victim's right forearm consistent with her report that Ibn-Ford had cut her. The nurse swabbed the victim's mouth, anus, and vagina and collected samples in a rape kit for later analysis.

{¶30} Jennifer LaCava, a forensic scientist in the biology section of the Bureau of Criminal Identification and Investigation ("BCI"), testified that she tested vaginal samples in the victim's rape kit. The samples tested positive for the presence of semen. She sent the semen samples to Stacy Violi, a forensic scientist in the DNA section of BCI for analysis. Ms. Violi testified that she compared the semen sample to a known DNA standard for Ibn-Ford and determined that he was the source of the semen. Ms. Violi testified that semen persists inside the vagina for no longer than 72 hours.

{¶31} Deputy Larry Brown of the Summit County Sheriff's Office testified that he responded to Akron City Hospital regarding a domestic violence/rape investigation involving the victim and Ibn-Ford. He testified that the victim showed him her injuries and explained how her husband caused them. The victim reported to him that her husband threatened to kill her and call

Children Services Board if she made a sound as he forced her to engage in sexual intercourse at the hotel. Based on the victim's statement, the deputy collected a DNA sample from Ibn-Ford. He verified that the defendant and victim had been staying at the Value Place hotel on June 19, 2011. In addition, the deputy reviewed Ibn-Ford's criminal history based on the victim's claims of domestic violence because certain prior convictions would have an impact on the offense levels of the current domestic violence charges.

{¶32} Deputy Brown testified that, based on his experience, victims of domestic violence are often reluctant to report assaults out of fear of the perpetrator or because they are dependent on the perpetrator for support or accommodations. The deputy testified that he observed the same reluctance by rape victims, especially victims raped by a spouse. He testified that it often takes time to gather the information necessary to prosecute the perpetrators in those cases because of the victims' reluctance.

June 20, 2011

{¶33} Sonya Bonsu, R.N., was assigned to care for the victim at Akron City Hospital on June 20, 2011, after she was transported after losing consciousness. Ms. Bonsu testified that the victim was defensive about sharing information, and that she told the nurse that she did not want anyone except her children to visit her. Ms. Bonsu testified that, as she was at the nursing station desk, she saw a man out of the corner of her eye enter the victim's room. Remembering that the victim had told her that she did not want visitors, Ms. Bonsu rushed into the victim's room. Ibn-Ford was in his wife's room. When the nurse asked the victim whether she was fine, the victim gave her a "fake smile" that appeared forced to Ms. Bonsu.

{¶34} Ms. Bonsu testified that she asked the victim whether the man could stay in the room as the nurse performed a physical assessment of her patient. The victim agreed to let Ibn-

Ford remain in the room, although she appeared uncomfortable. The nurse testified that she flipped the victim over to check her bottom for sores. She testified that she became very uncomfortable when Ibn-Ford came over and began spreading the victim's bottom apart with his bare hands and commenting on various marks on and within her buttocks. The victim did not respond to the nurse's questions about the marks. Rather, Ibn-Ford spoke for her.

{¶35} Ms. Bonsu testified that she left the room after completing her physical assessment of the victim, although she remained close and checked on her every few minutes. She testified that the victim always smiled or giggled and asserted that she was fine, but her reactions did not seem genuine. During one time when she was out of the victim's room, the nurse heard the sounds of a struggle and looked to see Ibn-Ford and the victim standing in the doorway. Ms. Bonsu saw Ibn-Ford shove the victim. The victim's body hit the door with a bang. The nurse then saw Ibn-Ford "throw his leg" towards the victim, although she did not see the foot land because the victim was out of her sight inside her room. Ms. Bonsu rushed into the room, told Ibn-Ford to leave, and she called security. Ms. Bonsu testified that the victim informed her that Ibn-Ford had "kicked her in the behind" and took her car keys.

{¶36} Alex Spear, a security officer in Summa Health System's Protective Services Department, testified that he was providing security at Akron City Hospital on June 20, 2011, when he received a call around 3:00 a.m. about a patient and visitor who were involved in a scuffle. Nursing staff reported a loud "boom" by the elevator and informed security that the visitor had left the area. Mr. Spear identified Ibn-Ford based on the visitor's description given to him by the nursing staff. He testified that he tried to stop Ibn-Ford but that he was "determined" to exit. Ibn-Ford attempted to "walk through" Mr. Spear, and refused to talk to the security officer. After two additional security officers arrived, Ibn-Ford began "chest bumping" all of

them, hurling racial slurs, and raising his fists in a threatening manner. The security officers were able to place Ibn-Ford in handcuffs and escort him back into the hospital to wait for the police to arrive. Mr. Spear testified that he searched Ibn-Ford and found the victim's car keys that she had reported that the defendant had taken from her purse in her hospital room. Mr. Spear did not see the altercation between Ibn-Ford and the victim. The security officer testified that he remembered first seeing Ibn-Ford when the defendant walked past the emergency room desk after visiting hours were over. He testified that he did not stop Ibn-Ford at that time because he "looked very determined, on a mission," so he assumed that the visitor knew where he was going.

{¶37} Anthony Harmon, another Summa Health System Protective Services officer, testified that he also responded to the security call regarding Ibn-Ford. He caught up to Ibn-Ford at the hospital exit where he was resisting and pushing Mr. Spear. Mr. Harmon handcuffed Ibn-Ford and called the police. The security officer testified that Ibn-Ford read his name tag and assured the officer that he would remember him. The defendant referred to a third security officer in a derogatory manner after the officer frisked him.

{¶38} The victim testified that she passed out in a gas station restroom and awoke in the hospital. She testified that she told her nurse that she did not want Ibn-Ford to visit her, although he appeared in her room. She believed that her home health aide had contacted her husband after she collapsed.

{¶39} The victim testified that, while in her hospital room, her husband demanded money and became angry when she told him that she had given her money to her daughter, P.D. She testified that Ibn-Ford took her purse and began rifling through it. He took her car keys.

15

The victim called the police but hung up after being distracted by her husband's actions. She testified that her husband punched her in the face and called her an "ugly bitch."

{¶40} The victim testified that she attempted to retrieve her keys and "mugged" him in the face. She testified that her husband then turned around and kicked her "so hard that [she] ran into the door."

{¶41} When the police arrived, the victim testified that she told them that her husband had hit her but she did not mention the earlier rape because she felt uncomfortable disclosing that information to the male officers. She testified that she reported both the physical assaults and the rape to the DOVE worker because she felt comfortable talking to a female nurse.

{¶42} Officer Moenich testified that, when he arrived at the hospital in the middle of the night on June 20, 2011, Ibn-Ford was already in handcuffs and being detained by hospital security. He spoke with the victim who reported that her husband kicked her into the door after a fight about money and keys. He observed bruising on the right side of the victim's face. The officer testified that the victim was crying, appeared distressed, and spoke in hushed tones.

{¶43} Ms. Prulhiere testified that the victim described the assault in the hospital, reporting that her husband had punched the right side of her face, kicked her "butt," pushed her, and threatened her with homicide and suicide. She testified that the victim exhibited injuries consistent with her report.

{¶44} Reviewing the evidence in a light most favorable to the State, this Court concludes that any rational trier of fact could have found the essential elements of the charges of rape and domestic violence were proved beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus.

{¶45} The State presented evidence that, although the victim had had consensual sexual relations with her husband four days earlier, she told him that she did not want to have sex on June 19, 2011, because she was in pain associated with terminal cancer. There was evidence to show that Ibn-Ford nevertheless compelled the victim through physical force and threats to her, himself, and her children to submit to vaginal, oral, and attempted anal intercourse. The victim testified that he strangled and cut her. Her forearm showed evidence of having been cut. The defendant's preparation and plan to compel sexual relations with the victim mirrored his preparations and plans to compel sex from the victim and her daughter on other occasions. The evidence demonstrated that he used threats before and after the rapes and weapons during the incidents to compel his victims' compliance and silence. Ibn-Ford's sperm was found in the victim's vagina. The BCI forensic scientist testified that sperm does not persist in a vagina for more than 72 hours, so the sperm could not have remained from the couple's consensual sex on June 15, 2011. Many professionals testified regarding the dynamics between a victim of long-term abuse and her abuser, including the inability of victims in intimate relationships with their abusers to recognize that they are being sexually assaulted. The evidence demonstrated that the victim was able to report the rape only when she felt comfortable with a female nurse. In this case, the State presented sufficient evidence of the crime of rape.

{¶46} The State presented evidence that, on June 19, 2011, in their hotel room, Ibn-Ford cut and otherwise physically assaulted the victim. The victim reported the incident to Ms. Prulhiere who documented injuries consistent with the victim's report. Other witnesses also testified regarding their observations of the victim's injuries. In addition, the victim testified that her husband threatened to kill her, kill himself, and cause her children to be removed by Children

Services Board. Accordingly, the State presented sufficient evidence of the crime of domestic violence as charged to have occurred on June 19, 2011.

{¶47} The State presented evidence that, on June 20, 2011, in her hospital room, the victim suffered additional injuries at the hands and feet of Ibn-Ford. Nurse Bonsu testified that she saw Ibn-Ford shove his wife and raise his leg as if to kick her. The victim, who was out of the nurse's sight during part of the assault, verified that her husband kicked her. She testified that Ibn-Ford threatened her life and his own in the hospital room too. Ms. Prulhiere documented injuries consistent with the victim's claims. Accordingly, the State presented sufficient evidence of the crime of domestic violence as charged to have occurred on June 20, 2011.

{¶48} Ibn-Ford's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶49} Ibn-Ford argues that his convictions were against the weight of the evidence. This Court disagrees.

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

> Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. *Thompkins*, 78 Ohio St.3d at 387. Further when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. *Id*.

*State v. Tucker*, 9th Dist. No. 06CA0035-M, 2006-Ohio-6914, at ¶ 5.

{¶50} This discretionary power should be exercised only in exceptional cases where the evidence presented weighs heavily in favor of the defendant and against conviction. *Thompkins*, 78 Ohio St.3d at 387.

{¶51} In his defense, Ibn-Ford presented the testimony of Jequetta Johnson, the victim's home health aide for a two-month period, including June 19 and 20, 2011. Ms. Johnson testified that she went to the Value Place hotel on the morning of June 19, 2011, to assist the victim in her daily routine. She did not witness any assault by Ibn-Ford on the victim. She testified that the victim did not tell her that Ibn-Ford had physically or sexually assaulted her. Ms. Johnson went so far as to testify that it was hard for her to believe that Ibn-Ford could have raped the victim given the victim's tumor. She testified that she accompanied the victim to the hospital after she passed out in the gas station restroom. She testified that the victim called her husband from the hospital.

{¶52} Ms. Johnson testified that she knew the victim to lie to her doctors to obtain extra pain medications. She also testified that the victim mentioned that all she had to do was make one phone call and Ibn-Ford would be back in prison.

{¶53} Ms. Johnson testified that she had only been a home health aide for one month before working for the victim. She admitted that she had a prior felony conviction for drug possession that she failed to disclose on her employment application. She testified that she and the victim had a falling out a few days after the assaults because she went to a hair convention instead of coming to assist the victim. Ms. Johnson testified that she stayed with the victim in the hospital "all night" although no member of the hospital staff mentioned that she was there.

Finally, Ms. Johnson admitted that she did not want to appear in court to testify because she did not want to "snitch" on anyone.

**{¶54}** This Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the trier of fact chose to believe certain witness' testimony over the testimony of others. *State v. Crowe*, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, ¶ 22.

**{¶55}** A thorough review of the record indicates that this is not the exceptional case where the evidence weighs heavily in favor of Ibn-Ford. The weight of the evidence supports the conclusion that Ibn-Ford raped the victim. The method described by the victim was consistent with the preparation and plan the defendant used to rape the victim's daughter. The victim's forearm showed evidence of cuts, consistent with the victim's claims that her husband used a knife to compel her to submit to sexual conduct with him. The victim described a long history of abuse by the defendant, during which he consistently beat her and punished her with beatings when she disobeyed him. The victim responded to the professionals involved in this case in a manner consistent with that reasonably expected of a victim of long-term abuse within the context of a spousal relationship. The professionals involved in this case testified regarding evidence that corroborated the victim's claim that her husband compelled her by force and threats to submit to sexual conduct. Accordingly, Ibn-Ford's conviction for rape is not against the manifest weight of the evidence.

**{¶56}** Moreover, the weight of the evidence supports the conclusion that Ibn-Ford committed domestic violence against the victim on both June 19 and 20, 2011. The victim testified that her husband cut her with a knife, strangled her, and "whooped" her with a belt on her bare bottom in their hotel room. Professionals and medical reports corroborated injuries consistent with those allegations. Other witnesses at the hospital saw Ibn-Ford shove his wife

into the door and raise his leg as if to kick her. In addition, the victim testified that her husband threatened to harm himself in both the hotel room and hospital room as he was otherwise threatening and beating the victim. Accordingly, Ibn-Ford's convictions for domestic violence are not against the manifest weight of the evidence.

{¶57} Ibn-Ford's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY PERMITTING THE [TESTIMONY] OF AN ALLEGED VICTIM IN [IBN-FORD'S] PRIOR CONVICTION FOR CHILD ENDANGERING.

{¶58} Ibn-Ford argues that the trial court erred by allowing the victim's daughter, P.D., to testify regarding her alleged rape by the defendant which resulted in his prior conviction for child endangering. Because Ibn-Ford has forfeited the issue on appeal, this Court does not reach the merits of his argument.

{¶59} The State filed a notice of its intent to use P.D.'s testimony regarding the underlying circumstances giving rise to Ibn-Ford's prior conviction for child endangering, i.e., that the offense was premised on his rape of the then-eleven-year old. Ibn-Ford did not file any opposition or motion in limine in regard to the State's notice of intent. Immediately prior to trial, however, he orally moved the trial court to exclude such testimony for the reason that it was not relevant to the prosecution and overly prejudicial. The trial court issued a preliminary ruling that it would admit the testimony. When P.D. later testified that Ibn-Ford raped her when she was eleven and described the circumstances of the event, Ibn-Ford failed to object.

{¶60} A motion in limine is "'a precautionary request * * * to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury.'" *Akron v. Carter*, 190 Ohio App.3d 420, 2010-Ohio-

5462, ¶ 7 (9th Dist.), quoting *State v. Echard*, 9th Dist. No. 24643, 2009-Ohio-6616, ¶ 3. Because the ruling is merely preliminary in nature, a party must object during trial when the issue arises in order to preserve the issue for appeal. *Echard* at ¶ 4, citing *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, ¶ 35. Where a party fails to preserve the claimed error by timely objection at a time when the trial court has the opportunity to resolve the issue when it arises, he has forfeited the issue on appeal. *State v. Grubb*, 28 Ohio St.3d 199, 203 (1986). Although forfeiture does not extinguish a claim of plain error pursuant to Crim.R. 52(B), this Court will not consider whether the admission of P.D.'s testimony regarding her prior rape by the defendant constituted plain error where Ibn-Ford has failed to argue plain error on appeal. *See In re W.H.*, 9th Dist. No. 23936, 2008-Ohio-4337, ¶ 5. Ibn-Ford's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

> THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTIN[G] [IBN-FORD'S] MOTION TO WITHDRAW HIS PRIOR GUILTY PLEA, WHEN HE HAD WITHDRAWN THE MOTION AT THE HEARING.

{¶61} Ibn-Ford argues that the trial court erred by granting his motion to withdraw his guilty plea. This Court disagrees.

{¶62} The parties agree that Ibn-Ford pleaded guilty to a reduced charge of gross sexual imposition and two counts of domestic violence after a jury was empanelled on the date initially scheduled for trial. The matter was scheduled for sentencing. Prior to sentencing, however, Ibn-Ford filed a motion to withdraw his guilty plea.

{¶63} The trial court held a hearing on the motion to withdraw the guilty plea. After the defendant indicated in court that he was not paying attention to the proceedings, the court cautioned him and noted that it had been concerned at the plea hearing too that Ibn-Ford had not

been paying attention but rather was "off in your mind * * *." When questioned regarding the basis for his motion, Ibn-Ford informed the court that he had discovered new evidence that he believed would exculpate him. The trial court asked for clarification regarding the new evidence, and defense counsel asserted that the victim had recanted her allegations pertaining to the charges, and particularly the charge of rape. The trial court further informed Ibn-Ford that if the court granted his motion and vacated his guilty plea, the court would set the matter for trial. The defendant asserted that he understood. Immediately after Ibn-Ford asserted that he did not commit the charged offenses but merely had sex with his wife, the trial court granted his motion to withdraw his plea and vacated his prior guilty plea. The defendant then began to argue that it would not be fair for the court to allow the State to present certain evidence. The trial court informed him that it was the court's decision to determine which evidence was proper. Ibn-Ford then stated that he did not want a trial date and that he just wanted to "get it done right here today."

{¶64} The defendant argues that the trial court erred by granting his motion to vacate because he had withdrawn it. The record tells a different story. Ibn-Ford did not withdraw his motion prior to the trial court's ruling on it. In fact, he argued that he had discovered exculpatory evidence that would preclude a conviction. The trial court granted him the relief he sought. "The defendant cannot now complain where the record shows that the trial court granted him all the relief that he requested." *State v. Morgan*, 8th Dist. No. 55341, 1989 WL 24929 (Mar. 16, 1989).

{¶65} After the court vacated the plea, Ibn-Ford attempted to secure assurances from the court regarding the admissibility of certain evidence. When the trial court explained that evidentiary matters remained within the court's discretion, the defendant became agitated and

expressed a new desire to conclude the matter at that time, presumably pursuant to the earlier plea agreement. It is immaterial that Ibn-Ford may have had yet another change of heart after receiving his requested relief but learning that he would not be able to control the State's presentation of its case or be assured that he would be allowed to present evidence that did not comport with the Ohio Rules of Evidence.

**{¶66}** In conclusion, Ibn-Ford moved to withdraw his guilty plea. He argued in support of his motion at the hearing. The trial court granted the motion, in part out of concerns that the defendant had not been paying attention when he entered his guilty plea. Any subsequent change of heart did not constitute a withdrawal of the motion. Ibn-Ford received his requested relief, and he cannot now complain only because the results of his criminal trial are not to his liking. The fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE PROSECUTOR'S REMARKS DURING CLOSING ARGUMENT WERE PREJUDICIAL AND DENIED [IBN-FORD] A FAIR TRIAL.

**{¶67}** Ibn-Ford argues that his convictions must be overturned on the basis of prosecutorial misconduct during closing arguments. This Court disagrees.

**{¶68}** When considering whether certain remarks constitute prosecutorial misconduct, a reviewing court must determine "(1) whether the remarks were improper and (2) if so, whether the remarks prejudicially affected the accused's substantial rights." *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, ¶ 142, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). The Ohio Supreme Court continued:

> The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." This court will not deem a trial unfair if, in the context of the entire trial, it appears beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments.

(Internal citations omitted.) *Jackson* at ¶ 142. The prosecutor's conduct must be considered in the context of the entire trial. *See Darden v. Wainwright*, 477 U.S. 168, 181-182 (1986).

{¶69} Ibn-Ford argues that the State's use of a power point presentation during closing arguments implied that he had the burden of proving his innocence. No copies of the power point slide(s) at issue are contained in the record on appeal for this Court's review. Moreover, Ibn-Ford cites to his own attorney's closing argument in support of his argument that the State attempted to shift the burden of proof to him, rather to any portion of the State's argument in support of this allegation. Under these circumstances, Ibn-Ford has not demonstrated misconduct on the part of the State.

{¶70} Ibn-Ford also argues that the State improperly appealed to the jurors' emotion on two occasions. First, he argues that the State improperly expressed fear that the victim's testimony was "going to get lost" and that the jury should "take her back there with you." Ibn-Ford's construction of the argument does not tell the whole story. In this case, the victim did not testify in court because she was too ill. Instead, the jury watched a video of her testimony given from a hospital bed. Taken in its proper context, the State was acknowledging that "something [] gets lost" when watching a video on a screen as compared with watching live testimony in person. The State merely asked the jury to "remember how [the victim] looked, what she said, what she said in her hospital room while she had to look at [the defendant]. And what she told you happened."

{¶71} Second, Ibn-Ford argues that the State made two improper references to his alleged rape of the victim's daughter. The parties stipulated, however, that Ibn-Ford had been convicted for child endangering regarding the victim's daughter. Moreover, the evidence adduced at trial indicated that that conviction was premised on his having engaged in sexual

conduct with the child. The State, here, merely referenced evidence that had been presented in the case without objection.

**{¶72}** Ibn-Ford did not object to these "emotional" arguments made by the State. Assuming arguendo that the State interjected emotion into its closing argument, we conclude that it did not improperly do so. As Judge Learned Hand observed, "the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture * * *." *United States v. Wexler*, 79 F.2d 526, 530 (C.A.2 1935). Moreover, the Ohio Supreme Court has recognized that, while a prosecutor's remarks may be intemperate, "some latitude and freedom of expression should be allowed." *State v. Woodards*, 6 Ohio St.2d 14, 26 (1966).

**{¶73}** Further assuming arguendo that the prosecutor's statements during closing argument were improper, her remarks did not prejudicially affect Ibn-Ford's substantial rights. Within the context of the entire trial, this Court concludes that Ibn-Ford's trial was not unfair because it appears beyond a reasonable doubt that the trier of fact would have convicted him even in the absence of the State's alleged improper argument. The evidence presented by the State demonstrates Ibn-Ford's guilt beyond a reasonable doubt. Accordingly, his argument that the State's comments during closing argument necessitate reversal of his convictions must fail.

**{¶74}** Ibn-Ford's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE TRIAL COURT COMMITTED REVERSIBLE AND PLAIN ERROR IN ASSESSING COURT COSTS AG[A]INST [IBN-FORD] WITHOUT COMPLYING WITH R.C. 2947.23(A).

**{¶75}** Ibn-Ford argues that the trial court erred by assessing court costs against him without first advising him of all statutory notifications pursuant to R.C. 2947.23(A). The State concedes error and this Court agrees.

**{¶76}** R.C. 2947.23(A)(1)(a), as in effect at the time of the sentencing hearing, stated:

In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs. At the time the judge or magistrate imposes sentence, the judge or magistrate shall notify the defendant of both of the following:

(i) If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in compliance with the approved payment schedule.

(ii) If the court orders the defendant to perform the community service, the defendant will receive credit upon the judgment at the specified hourly credit rate per hour of community service performed, and each hour of community service performed will reduce the judgment by that amount.

R.C. 2947.23(A)(1)(a)(i)/(ii).

**{¶77}** This Court has repeatedly recognized the trial court's obligation to comply with the statutory notification requirements. *State v. Ross*, 9th Dist. No. 25778, 2012-Ohio-1389, ¶ 28; *State v. Edwards*, 9th Dist. No. 25679, 2012-Ohio-901, ¶ 26; *State v. Debruce*, 9th Dist. No. 25574, 2012-Ohio-454, ¶ 37-38. We reasoned: "In effecting a statutorily mandated notification procedure, the legislature necessarily found it imperative that a criminal defendant be informed of the potential consequences of failing to pay a judgment for court costs." *Debruce* at ¶ 38.

**{¶78}** In this case, although the sentencing entry provided all required statutory notifications, the trial court failed to orally inform Ibn-Ford of all the statutorily mandated notifications at the time it imposed sentence at the sentencing hearing. Accordingly, "the proper remedy is to reverse the trial court's imposition of court costs and remand for the proper imposition of court costs in accordance with the requirements set forth in R.C. 2947.23(A)(1)." *Edwards* at ¶ 26. Ibn-Ford's sixth assignment of error is sustained.

**ASSIGNMENT OF ERROR VII**

THE CUMULATIVE EFFECT OF THE TRIAL COURT'S ERRO[]RS DENIED [IBN-FORD] A FAIR TRIAL.

{¶79} Ibn-Ford argues that the cumulative effects of errors at trial resulted in a violation of his right to a fair trial. This Court disagrees.

{¶80} Under the cumulative error doctrine, a conviction may be reversed when the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial even though none of the errors, in isolation was prejudicial. *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. In the absence of multiple errors, the cumulative error doctrine does not apply. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 132.

{¶81} In this case, Ibn-Ford has not identified errors in the trial court proceedings, so it cannot be said that cumulative errors deprived him of a fair trial. *See State v. Taylor*, 9th Dist. No. 09CA009570, 2010-Ohio-962, ¶ 40. Accordingly, his seventh assignment of error is overruled.

III.

{¶82} Ibn-Ford's first, second, third, fourth, fifth, and seventh assignments of error are overruled. His sixth assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is affirmed in part, reversed in part, and the cause remanded for further proceedings consistent with this opinion.

Judgment affirmed, in part,
reversed, in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

MOORE, P. J.
CONCURS.

BELFANCE, J.
CONCURRING.

{¶83} I concur. However, I write separately to note that this Court has stated that not all motions in limine are preliminary in nature. *See Akron v. Carter*, 190 Ohio App.3d 420, 2010-Ohio-5462, ¶ 7-9 (9th Dist.). While a motion in limine is typically "a precautionary request * * * to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside the presence of the jury[,]" (Internal quotations and citations omitted.) *id*. at ¶ 7, "[n]ot all motions in limine are aimed at evidence that may later become relevant and admissible if and when a proper foundation has been laid at trial. Some

evidence cannot ever become relevant and admissible." *Id*. at ¶ 8. Rulings on the latter type of motions in limine are not preliminary but, rather, definitive. *Id*. However, the motion in limine in this case concerned other acts evidence, and, therefore, Mr. Ibn-Ford had to object at trial to preserve the issue for appeal. *Id.* at ¶ 7. Thus, Mr. Ibn-Ford's third assignment of error is properly overruled because he forfeited the issue at trial and has not argued plain error on appeal.

APPEARANCES:

LEE A. SCHAFFER, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.