[Cite as *State v. Roy*, 2014-Ohio-5186.]

STATE OF OHIO )　　　　　 IN THE COURT OF APPEALS
　　　　　　　　　　 )ss:　　　 NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN )

STATE OF OHIO

　　　Appellee

　　　v.

SOMNATH ROY

　　　Appellant

C.A. No.　　　13CA010404


APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.　　07CR074732

DECISION AND JOURNAL ENTRY

Dated: November 24, 2014

---

CARR, Judge.

{¶1}　Defendant-Appellant, Somnath Roy, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms in part, reverses in part, and remands this matter for further proceedings.

I.

{¶2}　Prior to the allegations that arose in this matter, Roy was a family physician practicing out of an independent medical office in the Gates Medical Building. Several of Roy's patients as well as two women who responded to a job opening at his medical office came forward, alleging that Roy had sexually abused them while acting in his capacity as a physician. A grand jury ultimately indicted Roy on the following counts: (1) abduction, gross sexual imposition, and sexual imposition, with respect to Jocelyn B.H.; (2) gross sexual imposition and sexual imposition, with respect to Annette A.; (3) gross sexual imposition and sexual imposition, with respect to Jolene G.; (4) gross sexual imposition and sexual imposition, with respect to L.S.;

(5) gross sexual imposition and sexual imposition, with respect to Jennifer G.; (6) gross sexual imposition and sexual imposition, with respect to Shelby W.; and (7) sexual imposition, with respect to A.S. Before trial, the sexual imposition counts pertaining to A.S. and Shelby W. were dismissed on the basis that the statute of limitations had expired.

{¶3} Roy waived his right to a jury, and the matter proceeded to a bench trial. At the close of the State's case-in-chief, the court acquitted Roy of the three sexual imposition counts pertaining to Jolene G., L.S., and Jennifer G. The defense then presented its case-in-chief. At the close of trial, the court found Roy not guilty of three counts: the abduction count pertaining to Jocelyn B.H., the gross sexual imposition count pertaining to Jennifer G., and the gross sexual imposition count pertaining to Shelby W. The court found Roy guilty of the remaining six counts. Those counts were (1) gross sexual imposition and sexual imposition, with respect to Jocelyn B.H.; (2) gross sexual imposition and sexual imposition, with respect to Annette A.; (3) gross sexual imposition, with respect to Jolene G.; and (4) gross sexual imposition, with respect to L.S. The court sentenced Roy to community control.

{¶4} Roy now appeals and raises six assignments of error for our review. For ease of analysis, we rearrange several of the assignments of error.

II.

**ASSIGNMENT OF ERROR I**

THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTIONS OF GROSS SEXUAL IMPOSITION, R.C. §2907.05.

{¶5} In his first assignment of error, Roy argues that his four convictions for gross sexual imposition are based on insufficient evidence. Specifically, he argues that the State failed to produce any evidence on the element of force.

**{¶6}** "Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 113, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The test for sufficiency requires a determination of whether the State has met its burden of production at trial." *State v. Edwards*, 9th Dist. Summit No. 25679, 2012-Ohio-901, ¶ 7.

**{¶7}** R.C. 2907.05(A)(1) provides that "[n]o person shall have sexual contact with another, not the spouse of the offender[,] * * * when * * * [t]he offender purposely compels the other person * * * to submit by force or threat of force." Force encompasses "any violence, compulsion, or constraint physically exerted by any means upon or against a person * * *." R.C. 2901.01(A)(1). "One acts with force when he prevents his victim from moving away from him." *State v. Owen*, 9th Dist. Medina No. 3157-M, 2001 WL 1379474, *3 (Nov. 7, 2001). "[A] victim need not prove that * * * she physically resisted the offender in a prosecution for GSI." *State v. Antoline*, 9th Dist. Lorain No. 02CA008100, 2003-Ohio-1130, ¶ 66. *Accord* R.C. 2907.05(D).

**Annette A.**

**{¶8}** Annette testified that she became a medical assistant in January 2007 and applied for a job at Roy's office. She was 24 years old at the time and seeking a job where she could use her new degree. Roy called Annette and scheduled an interview with her. Annette interviewed

with Roy on March 28, 2007. At the end of the interview, Roy asked Annette to return the following day to begin learning her way around the office. According to Annette, Roy never indicated that she would need a physical exam as a condition of her employment.

{¶9}     The following day, Annette worked a full day at Roy's office. Roy then asked Annette to return on Saturday, March 31st. Annette worked that Saturday alongside another female staff member. After they finished seeing patients for the day, however, Roy "suggested * * * that if [Annette] felt comfortable, [the other staff member] could just go ahead and go home for the day." Annette testified that she did not feel that Roy was actually asking her if it was alright for her fellow employee to leave. Instead, she felt "like he was pretty much saying that she could leave."

{¶10}   Once Annette was alone with Roy, he called her into his office to speak with her. Roy then told Annette for the first time that she would need a physical exam if she wished to work at the office. Annette testified that Roy instructed her to get a new patient form from the front desk and then walked her back to one of the exam rooms. According to Annette, Roy never indicated that she could have her own physician complete the exam. Additionally, he never asked her if she would prefer to have a chaperone present for the exam.

{¶11}  Annette testified that Roy checked her height, weight, heart, and lungs before telling her to lift up her shirt. Annette testified that she assumed Roy intended to listen to her heart and lungs again, but that he pulled down her bra on the left-hand side and "fondled [her] breast." Roy then repeated his actions on the right-hand side and commented that Annette's breasts were small. Annette noted that Roy's exam was different than other breasts exams she had received in the past. She specified that the exam itself was "more of a squeezing" and that Roy never explained to her what he was doing or offered her a gown to cover herself. Annette

testified that she could feel Roy's legs against her knee as she sat on the exam table because he was standing so close to her. She further testified that she never told Roy she was uncomfortable during the exam because he was a doctor and doctors are "supposed to be trustworthy."

{¶12} After touching Annette's breasts, Roy had her lie down on the exam table and began feeling her stomach. When he was finished, Roy led Annette down the hall for an eye exam. Annette testified that there was a line on the floor to indicate where she should stand. As Annette began the eye exam, Roy came up to her, wrapped his left arm around her, and rubbed her left arm. Annette tried to step away to some degree and finished the exam.

{¶13} After the eye exam, Roy walked Annette towards the exit door. Annette testified that Roy then stood in front of the door with his arms out, as if he expected a hug from her. Annette testified that she gave Roy a "quick, weird hug" and left the office. Despite the fact that Annette was upset by the entire incident, she testified that she decided to return to work and see if things improved. She returned to the office on April 2, 2007.

{¶14} Annette stated that she worked the entire day on April 2nd without incident, but that Roy called her into his office at the end of the day. At that point, Roy told Annette that she would need to wear a padded bra to work so that her breasts would look bigger. Annette then left for the day. Later that same evening, Annette decided to go to the police station and file a report.

{¶15} Annette testified that she spoke with Detective Eric Van Kerkhove at the police station and that he asked her to place a recorded phone call to Roy. Annette complied, and the State introduced the recording of their phone conversation at trial. During the call, Roy admitted that he told Annette to wear a padded bra, but downplayed the statement as either a general

comment for her benefit or a "slip of the tongue." Roy also told Annette not to share his statement with anyone else.

**Jocelyn B.H.**

{¶16} Jocelyn testified that she applied for a job at Roy's office in March 2007, while going to school to become a licensed practical nurse. Jocelyn was 19 years old at the time and wanted to gain some experience in the medical field. Jocelyn testified that Roy called her on the evening of March 29, 2007, and asked her to come to the office for an interview. He gave Jocelyn his cell phone number so that she could call him when she arrived, as it would be after hours and his office door would be locked. According to Jocelyn, Roy never told her that she would have to undergo a physical exam as a condition of her employment.

{¶17} Jocelyn testified that her cousin drove her to the interview and remained in the car while she went inside. Once inside the medical building, she called Roy's cell phone and he unlocked the door to his medical office. Jocelyn testified that no one else was around during her interview with Roy and that Roy relocked the door to his medical office after letting her inside. He then took Jocelyn to his office and began asking her questions.

{¶18} Although Roy started by asking Jocelyn about her qualifications, she testified that the interview took a turn when Roy asked about her credit and she mentioned her Victoria Secret's credit card. Jocelyn testified that Roy then began asking her what type of items she would buy from the store and when she would wear them. He also asked her whether she had a boyfriend, how many men she had been with, and whether she used protection. Jocelyn testified that she was struck by the improper turn the interview had taken, but that she just kept answering Roy's questions because she did not know what else to do.

{¶19} Jocelyn testified that, after Roy finished questioning her, he asked her to step into one of the exam rooms so that he could see whether she knew how to take a patient's blood pressure and vital signs. Jocelyn stated that she went to grab her purse before leaving Roy's office, but that he told her she would not need it. Once inside the exam room, Jocelyn took Roy's blood pressure. He then asked her to sit on the exam table so that he could take her blood pressure. Jocelyn testified that, as Roy took her blood pressure, he stood in front of her. She further testified that she could feel that Roy had an erection because "his erection was rubbing on [her] knee." Jocelyn stated that Roy told her that her blood pressure was not normal and that she would need a physical exam. She testified that she did not leave or ask Roy to stop because she was afraid.

{¶20} Roy asked Jocelyn to lie down on the exam table. He listened to her chest and then asked her to sit up. Jocelyn testified that Roy listened to her chest once more, but then unsnapped her bra and told her to lie back down. He then began rubbing her stomach and "groping [her] boobs." According to Jocelyn, Roy never told her that he would be unsnapping her bra and never explained why it would be necessary for him to touch her breasts. She testified that Roy grabbed and squeezed her breasts and remarked "how beautiful they were." Jocelyn noted that, as she lay on the exam table, Roy was positioned between her and the door.

{¶21} Once Roy finished touching Jocelyn's breasts, he asked to her pull her pants down to see if she had any moles. Jocelyn testified that she complied, but that she only pulled her pants down to her knees because she was afraid and wanted to leave. She stated that Roy began rubbing the inside of her legs with his hands, so she pulled her pants back up and told him she "really [had] to leave." Roy, however, responded that he had not finished the physical and that Jocelyn needed to take an eye exam.

{¶22} Jocelyn testified that she stood in the office hallway and began to read the lines on the eye chart. As she did so, Roy placed his arms around her and began kissing her neck. Again, Jocelyn testified that she did not know what to do so she finished the eye exam. Even so, Jocelyn testified that she "kept telling [Roy] that [she] had to go" because her cousin was waiting for her outside. Roy eventually told Jocelyn that the interview was over. Jocelyn testified that, as Roy walked her to the door, unlocked it, and let her leave, he told her "that what is business is business and what's personal is personal."

{¶23} Shortly after Jocelyn left Roy's office, she went to the police station to file a report. Jocelyn spoke with Detective Van Kerkhove and agreed to place a recorded phone call to Roy. The State introduced the recording of their phone conversation at trial. During the call, Roy apologized to Jocelyn for groping and kissing her. He told Jocelyn that she had not been clear with him at his office, but that the two could have a professional relationship from that point forward if that was what she desired. Yet, Roy also indicated that, if Jocelyn decided she wanted to have sex with him, he was open to that possibility.

**L.S.**

{¶24} L.S. testified that she saw Roy as a patient in February 2006, when she was 15 years old and experiencing a variety of medical issues. L.S. stated that she was "really exhausted" and had a difficult time getting out of bed when she and her mother went to Roy's medical office for an appointment. She testified that she and her mother chose Roy as a physician because he had treated her sister's difficult medical condition and they considered him to be "a miracle worker."

{¶25} At L.S.'s first appointment with Roy, Roy consulted with L.S.'s mother about L.S.'s symptoms, took L.S.'s vitals, and checked her lymph nodes. L.S. testified that Roy then

reached underneath her clothes and groped her breasts in a painful manner. At the time, L.S. did not know what a breast exam should feel like, but she testified that she thought something was wrong and that the breasts exams she received later in life were nothing like Roy's painful grabbing. Moreover, she testified that Roy asked her "in depth about [her] sex life" at the appointment and "kept going on about it." L.S. testified that she did not report Roy's behavior to anyone because, at the appointment, Roy also discussed having her tested for leukemia and the need to consult with a cancer specialist. L.S. stated that she was scared about the possibility of having leukemia.

{¶26} Shortly after L.S.'s first visit with Roy, he had her hospitalized. L.S. testified that she was ultimately treated for infectious mononucleosis, but that her hospital stay involved significant testing and blood work. She testified that Roy came to see her in her hospital bed when she was alone, being medicated intravenously, and feeling "[h]orrible." According to L.S., Roy began telling her about the additional treatment she would need to receive and asked her again about her sexual history. She testified that, as he was explaining her course of treatment, Roy reached through the sleeve of her hospital gown and groped her breasts in a rough, squeezing manner. L.S. stated that Roy did not explain why he was touching her breasts. She testified that she did not question Roy's behavior, however, because she was very concerned about the possibility of having leukemia, confused about all of the treatment information he was giving her, and afraid to lose him as a physician. She specified that her "sister gave rave reviews for [Roy], and you're thinking he's a miracle worker and he's going to cure you, and * * * you don't want to lose that."

{¶27} Not long after her release from the hospital, L.S. saw Roy in his medical office. L.S. was accompanied by her mother. She testified that Roy once again reached under her

clothes and grabbed her breasts while examining her. Roy did not warn L.S. that he was going to touch her breasts or explain to her why it would be necessary to do so. L.S. testified that she stopped seeing Roy as a doctor after the appointment.

**Jolene G.**

{¶28} Jolene testified that she was Roy's patient from the beginning of 2005 until the summer of 2006. At the time, Jolene was in her late twenties. She sought out Roy to serve strictly as her family doctor, as she already had an OB/GYN who performed her breast exams as part of her annual exam. Jolene testified that Roy treated her for several conditions, including anxiety and depression, and that she was initially satisfied with their relationship. As time went on, however, Jolene became uncomfortable with Roy.

{¶29} Jolene testified that Roy began asking her invasive questions about her sexual health, including whether she or her boyfriend initiated sex. According to Jolene, when she told Roy that her boyfriend was the initiator, Roy told her "that if [she] didn't give [her boyfriend] the sex when he wanted it, he would go elsewhere." Jolene testified that, in all her years of treatment, her OB/GYN never asked her the type of questions that Roy asked her.

{¶30} Jolene also testified that she became uncomfortable with Roy because, on two separate occasions, he touched her breasts in a way she had never experienced before. She stated that Roy had her sit on the exam table to listen to her heart with a stethoscope. Roy stood very close to Jolene as he touched her and had Jolene leave on her shirt and bra. According to Jolene, after Roy listened to her heart, he would set down his stethoscope, place his hands under her shirt and bra, and fondle her. She specified that Roy would squeeze or grab her breasts by reaching underneath her bra cup and that her shirt would still be covering her breasts as Roy squeezed them. Jolene stated that Roy never explained why he was touching her breasts and did not

perform a breast exam in the manner to which she was accustomed. Although Jolene did not understand why Roy was touching her breasts, she stated that she remained silent because she was scared and did not want to accuse a doctor of touching her inappropriately if she was misinterpreting the situation. Jolene observed, however, that Roy appeared to be enjoying himself while he was touching her.

{¶31} Jolene testified that she went back to Roy after he touched her breasts the first time because she was not sure how to interpret what had happened. Her next visit occurred within a fairly short amount of time. Nevertheless, Jolene testified that Roy once again squeezed her breasts in the same manner that he had done before. According to Jolene, Roy did not tell her that he was going to touch her breasts or explain why it would be necessary for him to do so. Jolene decided not to return to Roy after the second time that he fondled her.

**Force or Threat of Force**

{¶32} Roy argues that his gross sexual imposition convictions are based on insufficient evidence because the State failed to prove that he compelled the four women described above "to submit by force or threat of force." R.C. 2907.05(A)(1). He argues that each of the women were over the age of 13, awake, and "in [a] position to refuse the touching in question." Yet, to secure GSI convictions against Roy, the State did not need to prove that any of the women physically resisted. *Antoline*, 2003-Ohio-1130, at ¶ 66; R.C. 2907.05(D). The question is whether, viewing the evidence in a light most favorable to the State, a rational trier of fact could have found that the State set forth evidence of any actual or threatened "violence, compulsion, or constraint physically exerted by any means" by Roy against the women. R.C. 2901.01(A)(1).

{¶33} In *State v. Owen*, 9th Dist. Medina No. 3157-M, 2001 WL 1379474 (Nov. 7, 2001), this Court considered a sufficiency challenge similar to the one at hand. Owen, a

chiropractor, was convicted after several women accused him of engaging in improper sexual contact with them during their chiropractic treatments. On appeal, Owen argued that one of his gross sexual imposition convictions was based on insufficient evidence because the State failed to prove that he compelled the victim to submit by force or the threat of force. *Owen* at *3. We described the facts relevant to that victim as follows:

> [The victim] went to see [Owen] for pain in her upper back and neck, and numbness in her arms. According to [the victim], she was topless during the examination except for the gown given to her by [Owen], and she had unfastened and slightly pulled down her blue jeans. She testified that while she was lying on her stomach on the examination table, [Owen] unnecessarily and without her consent massaged her bare breasts. She also stated that [Owen] massaged her buttocks and vaginal area through her blue jeans, until she wiggled around to make him stop. She further testified that [Owen] told her to turn over, and he again massaged her breasts and attempted to put his hand down the front of her blue jeans until she again wiggled herself to make him stop.

*Id.* This Court held that the State set forth sufficient evidence of force because the victim "testified that [Owen] was standing over her as she lay on the examination table and only stopped touching her erogenous zones when she wiggled away from his touch." *Id.* at *4.

{¶34} With regard to Annette A. and Jocelyn B.H., this Court finds that the State met its burden on the force element of gross sexual imposition. Both women testified that Roy isolated them in his medical office such that no one else was present when he touched them. In particular, Annette testified that Roy invited the only other employee in the office to leave before he touched her, and Jocelyn testified that Roy locked her inside the office with him when she arrived late at night for her interview. Both women testified that Roy brought them into one of the exam rooms and had them sit on the exam table, where Roy was positioned between them and the door. Roy placed his body up against the legs of both women as he squeezed their breasts, and Jocelyn testified that Roy rubbed his erection on her knee. Roy also made the women lie down on the exam table where he stood over them and rubbed their stomachs.

Jocelyn testified that Roy instructed her to stay even after she told him that she had to leave and that he put his arms around her and kissed her neck while she continued to tell him that she had to go. Annette testified that she tried to step away from Roy to some degree when he placed his arm around her and that Roy blocked the doorway when she attempted to leave, remaining there until Annette gave him a hug.

{¶35} "The relationship of the parties is a relevant fact when examining whether the element of force has been proven." *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, ¶ 12. Both Annette and Jocelyn were young women who approached Roy as a potential employer. Each woman was interested in a job in the medical profession, and Roy was an established physician who was in a position to either help or hinder them in their pursuit of their professional goals. Additionally, by touching each woman under the guise of a physical examination, Roy ceased to be strictly a potential employer. Instead, he touched each woman in his capacity as a practicing physician; a position of trust. Viewing the evidence in a light most favorable to the State, we must conclude that the State set forth evidence from which a rational trier of fact could have found that Roy employed either compulsion or constraint to compel Annette and Jocelyn to submit. *See Owen*, 2001 WL 1379474, at \*3-4. *See also* R.C. 2901.01(A)(1) (force defined). Therefore, with respect to those two women, Roy's gross sexual imposition convictions are based on sufficient evidence.

{¶36} With regard to L.S., we likewise conclude that the State met its burden on the force element of gross sexual imposition. In *State v. Eskridge*, the Ohio Supreme Court considered the quantum of evidence necessary to prove force in the context of a father's rape of his four-year old daughter. *State v. Eskridge*, 38 Ohio St.3d 56 (1988). The Supreme Court wrote that "[f]orce need not be overt and physically brutal, but can be subtle and psychological.

As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." (Internal quotations omitted.) *Id.* at 58-59, citing *State v. Martin*, 77 Ohio App. 553 (9th Dist.1946). The Court "recognize[d] the coercion inherent in parental authority when a father sexually abuse[s] his child" and determined that the element of force could be proven by evidence that the victim's will had been overcome. *Eskridge* at 58-59. *But see State v. Schaim*, 65 Ohio St.3d 51 (1992) (threat of force could not be inferred from father-daughter relationship where the rape victim was an adult and the State introduced no evidence that she believed her father might use physical force against her).

{¶37} This Court has applied *Eskridge* in cases where the victim, while not a child of tender years, was molested by someone in a unique position of authority. *See, e.g., State v. Clay*, 9th Dist. Medina No. 04CA0033-M, 2005-Ohio-6, ¶ 4-18; *Pordash*, 2004-Ohio-6081, at ¶ 11-14. In *State v. Clay*, we relied upon the Fifth District case of *State v. Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926. There, the Fifth District approved the application of *Eskridge* in a case where the defendant was charged with gross sexual imposition and the victims were several fifteen-year old girls who had had the defendant as their driving instructor. *Oddi* at ¶ 47-58. The Fifth District wrote:

> Although not a parent, or in loco parentis, appellant was certainly in a position of authority, and held a certain amount of power over an undoubtedly coveted prize to a child of fifteen-and-a-half of a driver's license. Each of the girls testified the conduct took place within the car; a closed environment with no easily accessible escape given the circumstances. The girls testified this conduct occurred while they were driving in deserted areas, unfamiliar to them. All of the girls testified they thought of stopping the car and getting out, but ultimately decided against it because of the bad weather, the unfamiliar area or what they believed appellant's reaction to the situation would be. While an adult might have managed the situation differently, our society does not generally expect a fifteen-year-old to have the emotional or practical experience necessary to face such a situation. Given all of the circumstances surrounding this case, we find no error in the trial court's force instruction.

*Id.* at ¶ 57. We once again agree with the Fifth District's rationale, as well as our prior case law on this matter.

{¶38} Although L.S. was not a child of tender years at the time Roy admitted her to the hospital, she was only fifteen years old. L.S. came to Roy at the recommendation of her sister and considered him to be "a miracle worker." She testified that she was very ill at the time and did not know what was wrong with her. She expressed the fear that she developed when Roy began discussing the possibility of her having cancer. After L.S. was admitted to the hospital at Roy's direction, L.S. described how Roy came to her hospital bed while she was alone and being medicated intravenously. She described how Roy began asking her again about her sex life while also telling her things about her treatment that she did not understand. She also testified about the pain that Roy caused her when he reached through her hospital gown and forcefully squeezed her breasts. L.S. testified that she did not want to challenge Roy's actions because she was afraid for her health and did not want to lose Roy's skills as a physician.

{¶39} Under these circumstances and viewing the evidence in a light most favorable to the State, we must conclude that the State met its burden of production on the element of force. The State set forth evidence that Roy used his position as a doctor to exert control over L.S., a fifteen-year old child, such that her will was overcome by fear or duress. *See Clay*, 2005-Ohio-6, at ¶ 7-18; *Oddi* at ¶ 47-58. *See also Eskridge*, 38 Ohio St.3d at 58-59. Therefore, with respect to L.S., Roy's gross sexual imposition conviction is based on sufficient evidence.

{¶40} With regard to Jolene G., this Court has conducted an exhaustive review of the record. Even viewing the evidence in a light most favorable to the State, however, we are unable to conclude that the State met its burden on the force element of gross sexual imposition. Jolene G. testified that Roy touched her breasts on two occasions, during appointments she had with

him at his medical office. Although Jolene said that Roy made her uncomfortable, she did not testify that she tried to pull away from him or vocalized her discomfort during the exams. The exams took place during normal business hours at Roy's medical office when other people were present in the office. Jolene did not testify regarding any type of compulsion or constraint beyond the sexual contact itself. Moreover, at the time Jolene went to see Roy, she was in her late twenties. *See Schaim*, 65 Ohio St.3d at 55 ("No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her [assailant] in the same manner as is a [child of tender years]").

{¶41} The State argues that Roy employed force against Jolene G. because he took advantage of a mental condition she possessed to compel her to submit. Specifically, Jolene acknowledged suffering from anxiety and depression at the time she sought treatment from Roy. The gross sexual imposition statute, however, specifically criminalizes such conduct under a separate subsection. *See* R.C. 2907.05(A)(5) (prohibiting one from engaging in sexual contact with another when the other's ability to resist is "substantially impaired because of a mental of physical condition" and the offender has knowledge of that inability). The State only charged Roy with violating R.C. 2907.05(A)(1), the subsection that requires proof of actual or threatened force. This Court cannot rely upon a different subsection of the gross sexual imposition statute so as to uphold his conviction. *See State v. Rohr-George*, 9th Dist. Summit No. 23019, 2007-Ohio-1264, ¶ 11-12. Instead, we must review the record for evidence in support of the crime for which Roy was indicted: gross sexual imposition under R.C. 2907.05(A)(1). The record reflects that the State failed to set forth any evidence that Roy employed either actual or threatened force to compel Jolene G. to submit. As such, with respect to Jolene G., we must conclude that Roy's gross sexual imposition convictions are based on insufficient evidence.

{¶42} Sexual imposition is a lesser-included offense of gross sexual imposition because it does not require proof of the additional element of force. *State v. Staab*, 9th Dist. Lorain No. 04CA008612, 2005-Ohio-3323, ¶ 7. Generally, "[w]hen the evidence shows that a defendant was not guilty of the crime for which he was convicted, but was guilty of a * * * lesser-included offense of that crime, we can modify the verdict accordingly, and remand the case for resentencing." *State v. Aberegg*, 9th Dist. Medina No. 10CA0129-M, 2012-Ohio-743, ¶ 16, quoting *State v. Skorvanek*, 182 Ohio App.3d 615, 2009-Ohio-1709, ¶ 12 (9th Dist.). Here, however, the trial court acquitted Roy of sexual imposition with respect to Jolene G. because the State failed to set forth any evidence to corroborate her testimony. *See State v. Economo*, 76 Ohio St.3d 56, 60 (1996). *See also* R.C. 2907.06(B) ("No person shall be convicted of [sexual imposition] solely upon the victim's testimony unsupported by other evidence."). This Court, therefore, cannot modify Roy's gross sexual imposition conviction so as to disturb the judgment of acquittal. Instead, we must reverse the conviction related to Jolene G. and remand the matter for the trial court to enter a judgment of acquittal.

{¶43} While this Court is bound to uphold the law as written, we are compelled to note the disparity that currently exists in the law when the relationship between an offender and a victim is one of doctor-patient. If an offender engages in sexual conduct with a victim, rather than sexual contact, he or she may be charged with sexual battery. *See* R.C. 2907.03(A). The sexual battery statute governs "a variety of situations where the offender takes unconscionable advantage of the victim." R.C. 2907.03, Legislative Service Commission Note (1973). One such situation is when the victim "is in custody of law or a patient in a hospital or other institution, and the offender has supervisory or disciplinary authority over the other person." R.C. 2907.03(A)(6). Yet, several districts have interpreted the foregoing language as applicable

to custodial-type settings, not as applicable to a typical doctor-patient relationship. *See, e.g.*, *State v. Arega*, 10th Dist. Franklin No. 12AP-263, 2012-Ohio-5774, ¶ 17; *State v. Bajaj*, 7th Dist. Columbiana No. 03 CO 16, 2005-Ohio-2931, ¶ 41. While the statute contains a provision specific to mental health professionals who misrepresent that sexual conduct "is necessary for mental health treatment purposes," R.C. 2907.03(A)(10), no such provision exists for general physicians.

{¶44} If an offender engages in sexual contact with a victim, rather than sexual conduct, he or she may be charged with gross sexual imposition. *See* R.C. 2907.05. That statute, however, does not criminalize sexual contact based on any special position of trust that the offender may occupy. There must be evidence that the offender used force, created or took advantage of an impairment caused by an intoxicant, or victimized someone under the age of 13. *See id.* Absent such evidence, the sexual contact likely constitutes sexual imposition, a misdemeanor offense that governs all offensive sexual contact, regardless of any special position the offender may hold. *See* R.C. 2907.06.

{¶45} Physicians play a critical role in our society. The doctor-patient relationship is one built on trust, with the patient agreeing to place his or her well-being in the hands of his or her chosen caregiver. Patients rely on the advice and expertise of their doctors and assume that their doctors have their best interests at heart. While an inappropriate touch would be cause for alarm if performed by an ordinary member of society, few would question the same touch if it occurred during a doctor's examination. Indeed, several of the women in this case testified that, even though Roy's conduct made them uncomfortable and afraid, they did not know whether they should report it, as he was a doctor and they were worried that they had misinterpreted the situation. If an offender is a physician, he or she is uniquely situated to abuse the trust placed in

him by virtue of his status as such. Consequently, while this Court applies the law as it is written, we urge the legislature to reexamine the law in this area.

{¶46} In sum, the State presented sufficient evidence to support Roy's gross sexual imposition convictions with respect to Annette A., Jocelyn B.H., and L.S., but insufficient evidence to support his conviction with respect to Jolene G. We reverse Roy's gross sexual imposition conviction with respect to Jolene G. and remand the matter for the court to enter a judgment of acquittal. Roy's first assignment of error is overruled in part and sustained in part.

## ASSIGNMENT OF ERROR II

THE EVIDENCE IS INSUFFICIENT TO SUSTAIN A CONVICTION OF SEXUAL IMPOSITION, R.C. §2907.06 AGAINST ANNETTE [A].

{¶47} In his second assignment of error, Roy argues that one of his convictions for sexual imposition is based on insufficient evidence. Specifically, he argues that the State failed to set forth any evidence to corroborate the testimony of Annette A. We disagree.

{¶48} We incorporate the standard of review for sufficiency set forth in Roy's first assignment of error. The sexual imposition statute provides, in relevant part, that "[n]o person shall have sexual contact with another, not the spouse of the offender[,] * * * when * * * [t]he offender knows that the sexual contact is offensive to the other person, * * * or is reckless in that regard." R.C. 2907.06(A)(1). The statute further provides that a person may not be convicted of sexual imposition "solely upon the victim's testimony unsupported by other evidence." R.C. 2907.06(B). The corroboration requirement is not a "question of proof" for the jury, but "a threshold inquiry of legal sufficiency to be determined by the trial judge." *Economo*, 76 Ohio St.3d at 60. "The corroborating evidence necessary to satisfy R.C. 2907.06(B) need not be independently sufficient to convict the accused, and it need not go to every essential element of

the crime charged. Slight circumstances or evidence which tends to support the victim's testimony is satisfactory." *Id.*

{¶49} This Court outlined Annette A.'s testimony in Roy's first assignment of error. Roy argues that her testimony was the only evidence that the State produced in support of his sexual imposition charge, so there was insufficient evidence of corroboration. He notes that there were no other witnesses to the alleged assault and the State did not produce any forensic evidence tending to show that the assault occurred.

{¶50} In *Economo*, the Supreme Court indicated its approval of the case of *Fitzgerald v. United States*, 433 A.2d 1295 (D.C.App.1982), in which that court wrote that "reasonably prompt reporting of [a sexual assault] to one's family, friends or police" constituted sufficient evidence of corroboration. *Economo* at 59, quoting *Fitzgerald* at 1301-1302. The *Economo* court itself found sufficient evidence of corroboration where medical records established that the defendant had access to the victim, the victim reported the alleged assault within several days of its occurrence, and the victim's sister testified that the victim had been afraid to be alone with the defendant. *Economo* at 60. A defendant's own statements can also serve as corroborative evidence. *See, e.g., State v. Golden*, 5th Dist. Stark No. 2008CA00182, 2009-Ohio-1624, ¶ 18-21.

{¶51} Annette testified that she went to the police station on April 2, 2007, five days after Roy touched her breasts and the same day that he told her she would need to wear a padded bra to work. She also made a recorded phone call to Roy. On the phone call, Roy admitted that he told Annette to wear a padded bra to work, but cast his statement as either a suggestion for Annette's benefit or a "slip of the tongue." He also admitted that he told Annette her breasts were small, calling his statement a "general comment." When Annette asked Roy why he

needed to touch her breasts, he stated that it "was just to see if anything was there." Likewise, when Annette asked Roy whether he received pleasure from touching her breasts, he indicated that it was "not like that." He, therefore, did not dispute that he touched her breasts. Moreover, Roy later admitted in a recorded interview with Detective Van Kerkhove that he had touched Annette's breasts, but that it was just a quick touch to "see if anything [was] there."

{¶52} Viewing the evidence in a light most favorable to the State, we must conclude that the State set forth sufficient evidence of corroboration. As noted above, "[s]light circumstances or evidence which tends to support the victim's testimony is satisfactory" to prove corroboration. *Economo* at 60. The fact that Annette reported the incident relatively quickly in conjunction with the admissions Roy made on the recorded phone call she placed to him and in his interview with Detective Van Kerkhove were sufficient to prove corroboration. Accordingly, Roy's second assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED BY CONSIDERING UNFAIRLY PREJUDICIAL OTHER ACTS EVIDENCE IN CONTRADICTION OF OHIO RULE OF EVIDENCE 404(B) AND STATE AND FEDERAL DUE PROCESS.

{¶53} In his third assignment of error, Roy argues that the trial court erred by admitting certain other acts evidence. We disagree.

{¶54} Under Evid.R. 404(B), other acts evidence "is not admissible to prove that the defendant acted in conformity with the character demonstrated by the other acts, but other acts evidence may be admissible for different purposes." *State v. Guerra*, 9th Dist. Lorain No. 12CA010188, 2013-Ohio-5367, ¶ 17. The Rule "contains a non-exhaustive list of exceptions under which other acts evidence may be admitted for a purpose other than to show propensity." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 41. It specifies, for example,

that other acts evidence may be admitted for purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

{¶55} The admission of other acts evidence is a three-step process:

The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20. When an appellant challenges the admission of other acts evidence, we review the trial court's decision for an abuse of discretion. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, syllabus. Under this "deferential" standard, "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Id.* at ¶ 14. Instead, a reviewing court must consider whether the trial court's decision lacked "a sound reasoning process." *Id.*, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶56} Roy argues that the trial court erred by allowing the State to present other acts testimony through two different witnesses: Michelle P. and Detective Van Kerkhove. We address each witness separately.

**Michelle P.**

{¶57} Michelle testified that she worked for Roy as a medical receptionist from approximately August 2005 to March 2007. In the fall of 2006, Michelle developed an infection on her left nipple and made an appointment with her gynecologist. Roy, however, would not permit her to take time off from work for the appointment. Michelle testified that Roy insisted on treating her himself.

{¶58} Michelle testified that Roy directed her to one of the exam rooms after he had finished seeing patients for the day. According to Michelle, she unclasped her bra at Roy's direction and Roy lifted her shirt. Michelle stated that, although only her left nipple was infected and the infection was "[v]ery visible," Roy squeezed both of her breasts. Michelle testified that Roy never explained why he had to touch her breasts and that his doing so made her uncomfortable. After Roy touched Michelle, he prescribed her an antibiotic that ultimately cured the infection.

{¶59} Michelle testified that Roy approached her in the office hallway at a later date and inquired as to whether the infection had cleared. At the point that Roy approached Michelle, all of the patients had left for the day. Michelle told Roy that her infection was gone, but he insisted on seeing her breast. Michelle testified that she ultimately relented and quickly lifted up her shirt in the hallway to show Roy her breast. Roy then said "okay." Once again, Michelle testified that the incident made her uncomfortable. She testified that she ultimately resigned from Roy's office because she wanted a higher paying job and did not like the office atmosphere. Michelle specified that Roy was "always hollering at you."

{¶60} Roy argues that the testimony outlined above was improper, as it was offered for the sole purpose of establishing that he "had a proclivity to act in a similar manner." He notes

that identity was never an issue in this case and that the alleged incident with Michelle did not help to form the background of any of his indicted offenses. Roy argues that he was prejudiced by the admission of Michelle's testimony because a great danger existed that the court would consider it as evidence that he was the type of person who would commit his indicted offenses.

**{¶61}** Identity is only one exception under which other acts evidence may be admitted. *See* Evid.R. 404(B). "[E]vidence of other crimes, wrongs, or acts of an accused may be admissible to prove intent or plan, even if the identity of an accused or the immediate background of a crime is not at issue." *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, at ¶ 2. In *Williams*, the defendant was charged with various acts of sexual misconduct in relation to a teenage boy whom he had mentored. During trial, the court permitted the State to introduce evidence that the defendant had sexually abused another teenage boy several years before, after having formed a mentoring relationship with that boy. Although identity was not at issue in the case, the Ohio Supreme Court upheld the admission of the evidence, noting that it tended to show the defendant's motive as well as "the preparation and plan he exhibited of targeting, mentoring, grooming, and abusing teenage boys." *Id.* at ¶ 22.

**{¶62}** Roy has not addressed *Williams* in his brief, so he has not offered any argument as to why, apart from identity, Michelle's testimony was inadmissible under Evid.R. 404(B). *See* App.R. 16(A)(7). The trial court specifically found that Michelle's testimony was admissible to prove Roy's motive, intent, and/or plan. Roy's defense was that any breast exams he conducted were legitimate medical procedures that were not performed for the purpose of his sexual arousal or gratification. *See* R.C. 2907.01(B) (sexual contact defined). If believed, Michelle's testimony tended to show that Roy required her to forego an appointment with her own doctor so that he could touch her breasts and later look at her breasts, over her objection, in the hallway of his

office. It also tended to rebut Roy's assertion that he only ever conducted legitimate breast examinations. Therefore, we cannot conclude that the trial court abused its discretion by determining that the testimony was relevant and offered for a legitimate purpose; to wit: Roy's motive, intent, and/or plan to commit the sexual offenses for which he was indicted. *See Williams* at ¶ 22-23. *See also State v. Shank*, 9th Dist. Medina No. 12CA0104-M, 2013-Ohio-5368, ¶ 19.

{¶63} To the extent Roy argues that the admission of Michelle's testimony was highly prejudicial, we note that this was a bench trial. "A trial judge in a bench trial is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision." *State v. Diaz*, 9th Dist. Lorain No. 02CA008069, 2003-Ohio-1132, ¶ 39. *See also State v. Bays*, 87 Ohio St.3d 15, 26-27 (1999). The court here specified that it was considering Michelle's testimony as evidence of Roy's motive, intent, and/or plan. Roy has not pointed to anything in the record to show that the court considered the testimony as evidence of his character. Moreover, the testimony tended to corroborate multiple claims of sexual abuse, all of which Roy had denied. We cannot agree, therefore, that Michelle's testimony was substantially more prejudicial than probative such that the court erred by admitting it. *See Williams* at ¶ 24.

{¶64} To the extent Michelle also testified that Roy always hollered at her, we note that Roy failed to object to that portion of her testimony and has not argued plain error on appeal. As such, we need not consider whether that portion of Michelle's testimony was proper other acts evidence. *See State v. Ibn-Ford*, 9th Dist. Summit No. 26386, 2013-Ohio-2172, ¶ 60 (declining to construct a claim of plain error on appellant's behalf with regard to a forfeited objection).

**Detective Van Kerkhove**

{¶65} Roy argues that the court erred by allowing Detective Van Kerkhove to testify that, during his police station interview, Roy focused on a female detective's breasts. The record reflects that Roy did not object to the Detective's statement at trial. Roy, therefore, forfeited his objection to the statement. *See State v. Hill*, 9th Dist. Summit No. 26519, 2013-Ohio-4022, ¶ 18. Although forfeiture does not extinguish a claim of plain error, Roy has failed to argue plain error on appeal. "[T]his Court will not construct a claim of plain error on behalf of an appellant who fails to raise such an argument in [his] brief." *State v. White*, 9th Dist. Summit Nos. 23955 & 23959, 2008-Ohio-2432, ¶ 33. Accordingly, we will not consider whether Detective Van Kerkhove's statement gave rise to plain error. Roy's third assignment of error is overruled.

## ASSIGNMENT OF ERROR V

THE TRIAL COURT UNDULY RESTRICTED THE APPELLANT'S RIGHT TO CONFRONTATION BY LIMITING QUESTIONING OF THE LEAD DETECTIVE AS TO IMPROPER CONDUCT OCCURRING SUBSEQUENT TO THE PRESENT CHARGES.

{¶66} In his fifth assignment of error, Roy argues that the trial court erred by not allowing him to cross-examine Detective Van Kerkhove with respect to certain misconduct that occurred after the investigation in this matter. Because Roy has forfeited this argument and has not argued plain error on appeal, we decline to address it.

{¶67} Prior to trial, the State made an oral motion in limine to prevent Roy from asking Detective Van Kerkhove about certain misconduct that occurred after the investigation in this matter. The court permitted both parties to present arguments on the motion. The court then granted the motion in limine on the basis that the line of questioning would not be relevant. When Detective Van Kerkhove later testified, Roy never sought to revisit the court's pre-trial ruling.

{¶68} "The trial court's ruling on a motion in limine is preliminary." *State v. Winston*, 9th Dist. Summit No. 24761, 2010-Ohio-1354, ¶ 12. "This Court is not required to decide whether a trial court's order granting or denying a motion in limine is proper if the claimed error is not preserved by objection, proffer, or ruling on the record at the pertinent part during the trial." *State v. Gay*, 9th Dist. Summit No. 26487, 2013-Ohio-4169, ¶ 28. "Where a party fails to preserve the claimed error * * * at a time when the trial court has the opportunity to resolve the issue when it arises, he has forfeited the issue on appeal." *Ibn-Ford*, 2013-Ohio-2172, at ¶ 60. The party may argue plain error on appeal, but this Court will not perform a plain error analysis on his behalf. *Id.*

{¶69} The record reflects that Roy forfeited the argument he now seeks to raise by not revisiting the court's preliminary ruling at trial. Moreover, Roy has not argued plain error on appeal. Because this Court will not construct a claim of plain error on his behalf, we need not consider whether the trial court committed plain error by restricting his cross-examination of Detective Van Kerkhove. *See id.* Roy's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR VI

THE VERDICT IS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶70} In his sixth assignment of error, Roy argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶71} A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶72} Initially, we note that Roy's manifest weight argument encompasses the conviction for gross sexual imposition that this Court reversed on the basis of insufficient evidence. That conviction pertained to Jolene G. Because we are reversing that conviction, we need not consider whether it is against the manifest weight of the evidence. Our review is limited to Roy's convictions for (1) gross sexual imposition and sexual imposition with respect to Annette A., (2) gross sexual imposition and sexual imposition with respect to Jocelyn B.H., and (3) gross sexual imposition with respect to L.S.

{¶73} Roy argues that the trial court lost its way when it chose to believe the testimony of the alleged victims in this matter. He avers that the State failed to introduce any physical evidence in support of the charges against him and that several of the alleged victims engaged in behavior that was inconsistent with their claims of sexual assault. With respect to Annette A., he notes that she returned to the office to work after she claimed the assault took place and never testified that she told Roy to stop during the exam. With respect to Jocelyn B.H., Roy notes that she failed to mention his erection in her original police statement and had a financial motive to lie, as she admitted that she had filed a civil suit against him. With respect to L.S., Roy notes that she never sought help from any of the staff members at the hospital after the alleged assault and that she returned to him for treatment on more than one occasion after her release from the

hospital. Further, he notes that L.S. only came forward after the release of a newspaper article, detailing the allegations of sexual abuse that other women had made about him.

{¶74} Multiple women in this case, who were strangers to one another, testified that Roy squeezed and fondled their breasts without warning and in a manner inconsistent with standard breast examinations. Dr. Leonard Kanterman testified as a board certified doctor in internal medicine and chairman of the medical ethics committee at Trumbull Memorial Hospital. According to Dr. Kanterman, the Ohio State Medical Board adopted a standard of care in November 2006, requiring doctors to offer the presence of a chaperone to patients in need of breast exams. Dr. Kanterman testified that a doctor who fails to at least offer a chaperone to his patient before conducting a breast exam has violated the standard of care. He also testified that proper breast exams involve palpitations with the fingers and cannot be performed while a patient's bra is in place. While Dr. Kanterman agreed that a doctor can require potential employees to undergo a physical, he testified that a potential employee must be allowed their choice of provider. He also opined that a breast examination would not be a proper part of a pre-employment physical.

{¶75} Several of Roy's former patients testified in his defense and noted their satisfaction with his level of care. Several of those same patients, however, testified that Roy would never perform their breast examinations because he would always refer them to their OB/GYNs. Additionally, three of Roy's former employees testified that Roy never required them to undergo a physical exam as a condition of their employment.

{¶76} Both Annette and Jocelyn testified that Roy touched their breasts when they interviewed with him. Both women testified that they were alone with Roy in his medical office when he touched them and that Roy squeezed their breasts instead of palpitating them. Annette,

in particular, testified that she was still wearing her bra when Roy touched her breasts. Roy admitted both in the recorded phone calls that were introduced and his recorded police interview that he touched the breasts of both women, but claimed that he did so as part of their pre-employment interview.

{¶77} L.S. admitted that she never told anyone that Roy had touched her inappropriately, but explained that she was afraid to do so because she did not want to lose him as a doctor at a time when she might have cancer. L.S. testified that she was very sick and believed Roy to be "a miracle worker." As for not telling the police what Roy had done after she recovered from her illness, L.S. testified that she was initially hesitant to come forward because she thought it was her fault that she had not objected when Roy touched her. After seeing that other woman were accusing Roy of the same thing, however, L.S. testified that she knew she had to come forward to prevent Roy from continuing to abuse other women in his practice.

{¶78} To the extent that the testimony of the alleged victims contained minor inconsistencies, the court was in the best position to evaluate their credibility. *See State v. Ross*, 9th Dist. Wayne No. 12CA0007, 2013-Ohio-522, ¶ 16. "[T]his Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge simply because the trial court chose to believe certain witnesses' testimony over the testimony of others." *Id.* Having reviewed the record, we cannot conclude that this is the exceptional case where the trier of fact lost its way by convicting Roy. *See Otten*, 33 Ohio App.3d at 340. Roy's argument that his convictions are against the manifest weight of the argument lacks merit. As such, his sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

GROSS SEXUAL IMPOSITION, R.C. §2907.05 AND SEXUAL IMPOSITION,
R.C. §2907.06 ARE ALLIED OFFENSES PURSUANT TO R.C. §2945.21.

**{¶79}** In his fourth assignment of error, Roy argues that the trial court erred by sentencing him to allied offenses of similar import. Specifically, he argues that he only should have been sentenced on two counts of gross sexual imposition because his sexual imposition convictions should have merged with those counts. The State concedes the error and asks this Court to remand the matter so that it may elect which offenses it will pursue against Roy.

**{¶80}** Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import * * * the defendant may be convicted of only one." The record reflects that Roy only engaged in sexual contact with each Annette A. and Jocelyn B.H. on one occasion and that, with respect to those two victims, his gross sexual imposition and sexual imposition counts were alternative theories, pertaining to the same conduct. Because the State concedes that the offenses pertaining to each victim were allied and our review of the record supports that conclusion, we agree that it is appropriate to remand the matter for resentencing, "at which point the State can elect which allied offense it will pursue against [Roy], consistent with the Supreme Court's directive in *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2." *State v. Washington*, 9th Dist. Lorain Nos. 10CA009767 & 10CA009768, 2011-Ohio-1149, ¶ 22. Thus, on remand, the State may elect to pursue (1) either the gross sexual imposition count or sexual imposition count with respect to Annette, and (2) either the gross sexual imposition count or sexual imposition count with respect to Jocelyn, for a total of two convictions. Roy's fourth assignment of error is sustained.

III.

**{¶81}** Roy's fourth assignment of error is sustained and his first assignment of error is sustained in part and overruled in part. His remaining assignments of error are overruled. The

judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

HENSAL, P. J.
WHITMORE, J.
CONCUR

APPEARANCES:

DAVID L. DOUGHTEN and KIMBERLY KENDALL, Attorneys at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.